UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

DIANE ALMANZA,

        Plaintiff,

   v.

WAL-MART STORES, INC., JOHN SEIBERT, and DOES 1 through 20,

        Defendants.

NO. 06-0553-WBS-GGH

MEMORANDUM AND ORDER RE: MOTION FOR SUMMARY ADJUDICATION

----oo0oo----

Plaintiff Diane Almanza ("Almanza") brought this action pursuant to the California Fair Employment and Housing Act ("FEHA"), California Government Code §§ 12900, et seq., alleging that defendants Wal-Mart Stores, Inc. ("Wal-Mart") and John Siebert ("Siebert") failed to take all reasonable action to prevent and correct discrimination, harassment, and retaliation in the workplace. Currently pending before the court is defendants' motion for summary adjudication.

I.   Factual and Procedural Background

Wal-Mart employed plaintiff as an "unloader" at its Manteca store from approximately September, 2000 to September,

1

2003.  (Defs.' Mot. for Summ. Adjud. 4:22-23.)  Wal-Mart unloaders such as plaintiff generally work in crews of six to eight, and are compensated on an hourly (as opposed to salaried) basis.  (Defs.' Statement of Undisputed Facts ("DSoF") ##1, 2.) Their primary responsibility involves unloading tractor-trailer trucks that arrive at the store with merchandise during each shift. (DSoF #5.)  Unloaders work inside the trucks, placing boxes onto a conveyor belt, then removing the boxes from the belt and placing them onto wooden pallets, and then transporting merchandise to the sales floor.  (Id. ##5-7.)  In addition, unloaders will occasionally assist Wal-Mart associates by stocking the sales floor shelves with merchandise in particular departments.  (Id. #8.)

     Siebert began working as an unloader in 1998.  (Id. #10.)  In 2000, shortly before plaintiff joined Wal-Mart and became part of his crew, Siebert became the "Lead Unloader." (Id. #11.)  As Lead Unloader, Seibert ensured the other unloaders removed and stacked freight quickly and efficiently, asked unloaders to find empty pallets for incoming merchandise, and occasionally instructed unloaders to bring merchandise to the sales floor to stock on shelves.  (Id. ##13, 16-17.)  However, Seibert also continued to unload merchandise from the trucks alongside the other unloaders.  (Id. #15.)

     In late 2001, Seibert switched to the overnight shift, and his job title changed to "Lead Unloader/Support Manager." (Id. #19.)  With the "Support Manager" title, Wal-Mart provided Seibert with a set of store keys, which enabled him to open the

rear doors of the store[1] and to unlock cash register drawers for cashiers to transport their cash envelopes to the appropriate office at the proper times. (Id. ##24-26.) After about six months, Seibert returned to his previous shift (rejoining plaintiff), although he retained his title as "Lead Unloader/Support Manager." (Id. #20.) At all times during his employ, Wal-Mart compensated Seibert on an hourly (not salaried) basis. (Id. ##11, 22.)

       On November 16, 2005, plaintiff filed a complaint in state court alleging a single cause of action under FEHA. (Compl.) Plaintiff asserts that throughout the span of her employment, Seibert subjected plaintiff to a continuing pattern of sexual harassment, and that her continued employment, as well as job benefits, were conditioned upon acquiescence to such conduct. (Compl. ¶ 8.)[2] Plaintiff further contends that she complained of Seibert's conduct to senior Wal-Mart employees, but that no action was taken and the harassment continued. (Id.) Defendants now bring a motion for summary adjudication on two specific issues, asking the court to find that, as a matter of law: 1) Seibert was not plaintiff's "supervisor" as defined under FEHA; and 2) plaintiff cannot establish a prima facie case of punitive damages against Wal-Mart. (Defs.' Mot. for Summ. Adjud. 1-2.)

---

[1] Keys to the rear doors enabled Seibert to access merchandise in storage trailers in the parking lot in less time than it would take a salaried Manager to come from the sales floor to do the same. (Id. #24-25.)

[2] The case was removed to this court based on diversity jurisdiction. (March 15, 2006 Not. of Removal.)

3

II. Discussion

    A.   Legal Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' [and] designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e); Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989). However, any inferences drawn from the

4

underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Upon a showing that there is no genuine issue of material fact as to particular claims or defenses, the court may grant partial summary judgement in the moving party's favor upon all or any part thereof. Fed. R. Civ. P. 56(a), (b); see also Wang Labs., Inc. v. Mitsubishi Elecs, Am., Inc., 860 F. Supp. 1448, 1450 (C.D. Cal. 1993). The standards and procedures are the same for summary adjudication of a claim as for summary judgment. Wang, 860 F. Supp. at 1451.

B.   Meaning of Supervisor Under FEHA

FEHA imposes "two standards of employer liability for sexual harassment, depending on whether the person engaging in the harassment is the victim's supervisor or a nonsupervisory employee." State Dept. of Health Servs. v. Superior Court, 31 Cal. 4th 1026, 1040-1041 (2003). Harassment of one employee by another employee (not an agent or supervisor) is unlawful only if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. Cal. Gov. Code § 12940(j)(1). However, FEHA provides that an employer is strictly liable for harassment perpetrated by its supervisors and agents. Chapman v. Enos, 116 Cal. App. 4th 920, 928 (2004) (quoting Doe v. Capital Cities, 50 Cal. App. 4th 1038, 1046 (1996)).[3] Accordingly, the issue of

---

[3] Similarly, with respect to retaliation, "an individual-supervisor may be held personally liable for retaliation under the FEHA." Winarto v. Toshiba Am. Elecs.

whether Seibert was a "supervisor" as defined by FEHA is central to the ultimate determination of the nature and scope of liability, and it is this first point upon which defendants seek summary adjudication.

Under FEHA, a supervisor is defined as:

> [A}ny individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgement.

Cal. Gov. Code § 12926(r). The court must construe the FEHA definition broadly so as to protect employees' rights to seek and hold employment without discrimination. Champan v. Enos, 116 Cal. App. 4th 920, 931 (2004). Defendants argue that Seibert had none of the authority listed above and, in the alternative, that any actions taken by Seibert that sounded in this definition were merely autonomous responses to instructions from upper management.

1. <u>Assigning, Rewarding, and Directing Employees</u>

The parties do not dispute that only salaried members of Wal-Mart management had the authority to formally hire, discharge, promote, suspend, discipline, or transfer employees, and that Seibert was not a salaried member of management. (DSoF ##11, 27, 31.) However, plaintiff argues that Seibert had the ability to assign, reward, and direct other employees, and thus

---

Components, Inc., 274 F.3d 1276, 1288 (9th Cir. 2001) (emphasis added).

6

was plaintiff's supervisor as defined by FEHA.

First, it is undisputed that Wal-Mart's home office is responsible for fixing and setting the hours of the Unloaders' shifts, which defendants argue shows that Seibert has no discretion concerning these matters. (DSoF ##33-34.) Plaintiff, however, asserts that Seibert would routinely tell Unloaders whether or not to work past a rest or meal period, depending upon Seibert's opinion regarding what work needed to be done. (Pl.'s Resp. to DSoF ##33, 35; Declaration of Diane Almanza ¶ 56.) Moreover, if unloaders required absences, needed to arrive late at work, or wanted to take vacation or sick leave, Seibert would approve these requests. (Pl.'s Resp. to DsoF #30.)[4] Defendants deny the existence and scope of Seibert's authority in this respect, and thus a dispute continues to exist as to this material fact.

More importantly, the parties continue to dispute the true nature of Seibert's authority to direct the work of the unloaders in his crew, and how much discretion was involved. Defendants assert Seibert received daily instructions from the store manager or an assistant manager as to which store departments needed a replenishment of merchandise, and that all of Seibert's "instructions" to other employees in this or any regard involved no individual thought or discretion. (DsoF ##12, 18.) While not disputing that Seibert received daily instructions, plaintiff puts forth evidence showing that Seibert

---

[4] It remains unclear whether Seibert in fact approved these requests, or whether, along with his recommendation, he merely advised managers of the requests for formal approval. (Pl.'s Resp. to DSoF #30.)

7

routinely gave out assignments to other unloaders, ordered that particular employees stock merchandise in particular departments, and generally directed their work. (Pl.'s Resp. to DsoF ##12-14, 16-18, 36; Miramontes Depo. 23:24-24:1.) According to deposition testimony by plaintiff, other unloaders, and members of management, Seibert was afforded significant discretion in managing and controlling the unloading department. (Id. ##13, 27.) Finally, plaintiff provides evidence that Seibert was responsible for determining which employees received training and who was able to get overtime compensation.[5] (Id. #14; Almanza Decl. ¶ 56.) A legitimate dispute continues to exist as to the true extent of Seibert's control over, and ability to direct the work of, his fellow unloaders.

### 2. Recommending Employment Actions

The parties also continue to dispute the extent to which Seibert had the ability to influence employment actions against other employees via their written performance appraisals. The parties agree that Seibert's signature appeared on two such

---

[5] Although not controlling, federal law and the Equal Employment Opportunity Commission ("EEOC") guidelines may be instructive in resolving who is a "supervisor" under FEHA. See Fisher v. San Pedro Peninsula Hosp., 214 Cal. App. 3d 590, 606 (1989); Chapman, 116 Cal. App. 4th at 930. "[A] supervisor who does not have actual authority over an employee may nonetheless create vicarious liability for the employer 'if the employee reasonably believed that the harasser had such power.'" Chapman, 116 Cal. App. 4th at 930 (quoting EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors III.B. (June 1999)). In this case, Assistant Manager Karen Greer introduced Seibert to Almanza as the unloading department supervisor. (Pl.'s Statement of Facts ("PSoF") #130; Almanza Decl. ¶ 56.) Additionally, Seibert was the only apparent superior present in the unloading area on a regular basis. (Id.) Seibert also told the Unloaders that it was his input that controlled their raises and requests for vacation and sick leave. (Id.)

8

appraisals of plaintiff (as well as similar appraisals for other employees), however defendants assert that Seibert's signature was nothing but a rubber-stamp, afforded no weight by management. (Declaration of Kedron Blecha ¶ 16.)

Plaintiff, however, offers evidence, such as the deposition testimony of Manager Michael Loatman, which indicates that Seibert not only <u>filled</u> <u>out</u> some of the performance appraisals, but that managers afforded Seibert's recommendations substantial weight. (Pl.'s Resp. to DSoF #37; Loatman Depo. 14:4-13, 15:16-16:2; Almanza Decl. ¶ 56.) There exists a genuine issue of fact regarding the extent to which Seibert's input and evaluations were used to take tangible employment actions. Seibert's evaluations may have been used to promote, discharge or reward fellow employees, thereby effectively recommending those actions be taken and supporting the conclusion that he is a supervisor. <u>See</u> Cal. Gov. Code § 12926(r). Sufficient significant disputes over material facts exist so that the court cannot say at this time that Seibert was not plaintiff's supervisor as a matter of law. Accordingly, defendants' motion must be denied on this first issue.

C.  <u>Punitive Damages</u>

Under California Civil Code § 3294(b),

> An employer shall not be liable for [punitive] damages. . ., based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an <u>officer</u>, <u>director</u>, or <u>managing agent</u> of the corporation.

9

(emphasis added). For purposes of this particular section of their motion, defendants assume that 1) plaintiff can establish a viable harassment and/or retaliation claim and 2) that Store Manager Kedron Blecha and/or District Manager James Brown engaged in or ratified Seibert's conduct. Defendants' sole contention is that neither of these individuals are an "officer, director, or managing agent" of Wal-Mart, and thus plaintiff has failed to establish a prima facie case for punitive damages. Brown and Blecha are neither officers nor directors of Wal-Mart. (DSoF #48, 52.) Thus, the sole question raised is whether Brown and/or Blecha constitute "managing agents" for the purpose of imposing punitive damages.

Corporate liability for punitive damages depends on the extent to which an employee exercises substantial discretionary authority over decisions that ultimately determine corporate policy, rather than on an employee's managerial level. White v. Ultramar, 21 Cal. 4th 563, 576-577 (1999); Glovatorium, Inc. v. NCR Corp., 684 F.2d 658, 661 (9th Cir. 1982). Mere "supervisory status" does not mean that an employee is a "managing agent." White, 21 Cal. 4th at 577. "In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." Id. (finding that an employee who managed eight stores, over sixty-five employees, and made significant decisions affecting both store and company policy was a managing agent for the purposes of punitive damages).

1        Defendants argue that both Brown and Blecha were
2 supervisory employees who were required to follow and comply with
3 Wal-Mart's preestablished policies and procedures, and that they
4 exercised no substantial discretion of their own.  However,
5 Kedron Blecha, as "Store Manager" for the Manteca Wal-Mart store,
6 maintained the highest level management position in the store.
7 (PSoF #52; Blecha Depo. 16:21-23.)  Blecha was responsible for
8 the overall operation of the store, including the handling of all
9 employee issues such as who is hired, who is promoted, who is
10 disciplined, who is laid-off, who is transferred, who is
11 discharged, what position an employee is assigned to, whether to
12 give an employee a merit raise or an annual raise, and whether a
13 written policy applies or is followed.  (PSoF #52; Blecha Depo.
14 6:25-7:10; Ludwig Depo. 6:7-17.)  Of course, the ability to hire
15 or fire alone is insufficient to make an employee a managing
16 agent, White, 21 Cal. 4th at 577, but it is indicative of the
17 general level of responsibility and discretion afforded a
18 particular supervisor.  Id.

19        District Manager James Brown, Blecha's superior,
20 oversaw six Wal-Mart stores, including the Manteca Wal-Mart, each
21 with over 300 employees.  (PSoF #51.)  Brown's primary
22 responsibility was coordinating and facilitating the management
23 of those stores.  (Id.)  Additionally, plaintiff proffers
24 evidence that District Managers such as Brown were responsible
25 for, and had the authority to ultimately dispose of, harassment
26 and retaliation claims brought by Wal-Mart employees.  (Almanza

11

Decl. ¶¶ 50-51; McCabe Depo. 121:8-19.)[6]  Almanza states she contacted Brown to explain that she was fired in retaliation for her complaints about sexual harassment, but that Brown dismissed her complaint without any investigation.  (Almanza Decl. ¶ 54.)  A manager's ability to decide whether or not a particular policy is applied in particular circumstances is tantamount to making decisions that affect both the store and company policy. See White, 21 Cal. 4th at 577; see also Egan v. Mutual of Omaha, Ins. Co., 24 Cal.3d 809, 823 ("When employees dispose of insureds' claims with little, if any, supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation.").  Plaintiff has presented sufficient evidence to indicate a continuing dispute as to Brown and Blecha's exercise discretionary authority over significant aspects of Wal-Mart's business.  Accordingly, there is a genuine issue for trial with respect to Blecha and Brown's status as "managing agents," and defendants' motion for summary adjudication must be denied on this issue.

　　　　IT IS THEREFORE ORDERED that defendants' motion for summary adjudication be, and the same hereby is, DENIED.

DATED:  August 7, 2007

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[6]  The court takes judicial notice of the deposition testimony of Timothy McCabe, attached as Exhibit 10 to the Declaration of John Riestenberg.  See Fed. R. Ev. 201(d); United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980) (courts may take judicial notice of their own records).

12